# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-KA-01694-SCT

*MICHAEL SHANE MANIX*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 08/17/2002 |
| TRIAL JUDGE: | HON. JAMES W. BACKSTROM |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ROSS PARKER SIMONS |
| | H. BERNARD GAUTIER |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | TONY LAWRENCE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/17/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**BEFORE COBB, P.J., EASLEY AND GRAVES, JJ.**

**GRAVES, JUSTICE, FOR THE COURT:**

¶1.     Michael Shane Manix appeals from his conviction  of capital murder by the Circuit Court of Jackson County, Mississippi,  and  his  sentence  to a term of life imprisonment without parole in the custody of the Mississippi Department of Corrections.   Manix raises four assignments of error in the trial below:    (1) whether his right to a speed trial was violated; (2) whether the trial court abused its discretion in admitting photographs of the victim's body; (3) whether the jury was properly sworn; and (4) whether the trial court erred in denying

Manix's motion to suppress his pretrial statements. Finding no merit in these issues, we affirm the judgment of the trial court.

## FACTS AND PROCEDURAL HISTORY

¶2. On the night of May 16, 1998, Michael Manix, Elia Check and Michael Janes set out with the intent to engage in criminal activity. Manix, who was twenty-eight years old at the time, needed money to pay his car note and to make rent for the trailer he lived in with his girlfriend. Along with Check and Janes, both eighteen, Manix set out across the Mississippi Gulf Coast in search of a person to rob. Around one o'clock on the morning on May 18th, the three stopped at the new Super 8 Motel in Ocean Springs. The men sat in the parking lot and considered their options. Deciding to enter the motel, they approached the office and encountered Heather Hampton, the twenty-seven-year-old night clerk, who had walked outside for a quick cigarette break. They asked her if any rooms were open, but she told them the hotel was full. Then she graciously offered to find them rooms elsewhere. Manix then grabbed Heather and dragged her behind the counter of the Super 8, demanding that she give them money. Despite the fact that Heather did not struggle and begged him not to hurt her, Manix stabbed her thirteen times with a knife. The men cleaned out the cash drawer of the hotel, leaving behind only $1 bills and coin change. Manix, Check and Janes returned to their vehicle and made their escape with $456. Despite the efforts of the police officers and emergency medical technicians who were summoned to the scene, Heather lost so much blood that even after she regained a pulse it could not be sustained, and she died.

¶3. After their capture, the three men were jointly indicted for capital murder by a Jackson County Grand Jury. They were tried separately, and on August 15, 2002, Manix was convicted

2

of capital murder. The jury could not unanimously find that he deserved the death penalty, and so the trial judge entered a sentence of life without parole in the custody of the Mississippi Department of Corrections.

## ANALYSIS

### I.      Whether Manix was denied a speedy trial?

¶4.      Manix argues that he was deprived his constitutional and statutory rights to a speedy trial because almost four years (precisely, 1,430 days) elapsed between his arraignment on the charge of capital murder and his trial. The following events and dates are key to understanding if Manix's rights were violated.

| Date | Event |
|---|---|
| 7/7/98 | Indictment |
| 9/11/98 | Arraignment (Trial Date (T.D.) 11/23/1998) |
| 9/21-22/98 | Orders entered for body search of defendant |
| 11/23/98 | First Date set for Trial |
| 12/22/98 | Notice of Trial (T.D. 2/22/99) |
| 1/25/99 | Motion to Continuance (defendant) |
| 1/26/99 | Order of Continuance |
| 4/19/99 | Notice of Trial (T.D. 5/24/99) |
| 6/9/99 | Scheduling Order (T.D. 8/30/99) (the court was involved with the trial of C. Douglas Gulley on the 5/24/99 trial date) |
| 7/8 & 13/99 | Motion to Continue (State) |
| 7/14/99 | Notice of Trial (T.D. 8/30/99) |
| 8/31/99 | Order of Continuance (requested by the State, although the court was involved in another trial at this time and was not available) |
| 9/3/99 | Scheduling Order (T.D. 12/6/99) |
| 10/1/99 | Order Appointing Special Prosecutor (Anthony N. Lawrence, III.) |
| 11/5/99 | Motion to Continue (defendant) |
| 11/12/99 | Order of Continuance (T.D. 7/17/00) |
| 2/24/00 | Order of Continuance (T.D. 7/17/00) |

| | |
|---|---|
| 5/12/00 | Order Appointing Special Prosecutor (Albert Necaise) |
| 6/30/00 | Motion to Continue (State) |
| 7/10/00 | Order of Continuance (T.D. 10/2/00) |
| 8/16/00 | Motion to Continue (defendant Ore Tenus) |
| 9/15/00 | Order of Continuance (T.D. 2/12/01) |
| 2/5/01 | Motion to Continue (defendant) |
| 2/12/01 | Order of Continuance (T.D. 4/9/01) |
| 4/3/01 | Motion to Continue (defendant) |
| 4/9/01 | Order of Continuance (T.D. July 2001 Term) |
| 9/17/01 | Notice of Trial (T.D. 11/5/01) |
| 10/18/01 | Motion to Continue (defendant) |
| 10/23/01 | Order of Continuance (T.D. 3/4/02) |
| 4/10/02 | Notice of Trial (T.D. 5/28/02) |
| 5/1/02 | Motion to Dismiss for Failure to Grant a Speedy Trial |
| 5/10/02 | Order of Continuance Sua Sponte (T.D. 8/12/02) |
| 8/02/02 | Order Denying Motion to Dismiss |
| 08/09/02 | Second Motion to Dismiss for Failure to Grant a Speedy Trial |
| 08/13/02 | Trial Commenced |

¶5.     A defendant in a criminal case in Mississippi has a guaranteed right to a speedy trial embodied in the  bedrock of the Sixth Amendment to the United States Constitution (applied to the states through the Fourteenth Amendment) and in Article 3, § 26 of the Mississippi Constitution.   In addition, our Legislature has seen fit to engrave particulars upon the abstract stone of the two constitutional rights; Miss. Code Ann. § 99-17-1 (Rev. 2000) creates a right to a speedy trial within 270 days after arraignment.

¶6.     Manix filed two motions to dismiss for failure to grant a speedy trial which were both denied by the trial court.  The trial court acknowledged that the massive delay was  unusual, but found that sufficient cause existed for the delays.   Manix disagrees and asserts that the trial court committed error by denying the motions.

4

¶7. Speedy trial claims necessarily entail questions of fact regarding "whether the trial delay rose from good cause." *DeLoach v. State,* 722 So.2d 512, 516 (Miss. 1998). We will uphold the trial court's findings on the issue of a speedy trial where supported by "substantial, credible evidence; [but] if no probative evidence supports the trial courts's finding . . . [we] will ordinarily reverse." *Ross v. State,* 605 So.2d 17, 21 (Miss. 1992). As in other cases in which the trial court must make factual determinations, we review those findings with a deferential standard that asks if the trial court made a "clearly erroneous" decision. *Stokes v. State,* 548 So.2d 118, 122 (Miss.1989). While the constitutional and statutory rights are factually intertwined, we will separate them to address the underlying legal issues.

### The Statutory Right

¶8. Our Legislature has mandated that:

> Unless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned.

Miss. Code Ann. § 99-17-1 (Rev. 2000). "The statutory right to a speedy trial attaches and time begins running after the accused has been arraigned." *Adams v. State*, 583 So.2d 165, 167 (Miss. 1991). The 270-day rule analysis is very fact specific and hinges upon whether the prosecution or the defense caused the delay. *Sharp v. State,* 786 So.2d 372, 378 (Miss. 2001). The statute also allows for continuances based upon a showing of good cause, making the reason for the delay just as important as the determination of which side is the delaying party. *Id.* at 377. For "[m]otions made and granted on behalf of the defense are charged against them." *Poole v. State*, 826 So.2d 1222, 1228 (Miss. 2002). In addition, "delay can be

attributed to the complexity of the crime, the number of defendants involved[,] and a congested docket, all of which is viewed as good cause if a continuance is actually granted for those reasons." *Id.* at 1228.

¶9.    The first step to determine if there is compliance with the 270-day rule is to calculate the total number of days between arraignment and the actual trial.   In the calculation, the date of arraignment is not counted, but the date of trial is; weekends are counted unless the 270th day is a Sunday.  *See Adams*, 583 So.2d at 167.  Manix was tried 1,430 days after arraignment, well after the 270 days provided for in the statute.  The delay is not as long as it appears, for the second step in calculating compliance with the 270-rule is to consider each delay separately, because only those delays attributable to the State count toward the 270 days. *Baine v. State,* 604 So.2d 258, 264 (Miss. 1992).  Any delay as a result of action by the State that is not supported by good cause will cause that time to be counted against the State.  *Wiley v. State*, 582 So.2d 1008, 1011 (Miss. 1991).  Yet a delay caused by the actions of the defendant, such as a continuance, will toll the running of the time period for that length of time, and correspondingly this time is subtracted from the total amount of the delay.  *Id.* at 1011.

¶10.    The first block of time to be considered is from arraignment on 9/11/98 to the first date set for trial--11/23/98.[1]  "The necessary time for the accused and his counsel to prepare his trial must necessarily be left largely to the sound discretion of the trial judge, bearing in mind the facts and circumstances of the particular case." *Id.* at 1012 ; *Gilmore v. State,* 225 Miss.

---

[1]In the trial court, the initial trial date was sometimes erroneously referred to as 9/23/1998.

173, 189, 82 So.2d 838, 846 (1955).  Two months is not an excessive amount of time for preparation for such a complicated creature as a capital murder trial; therefore the time does not count against either the State or Manix.

¶11.    The record then reflects that on 9/21 and 9/22/98 orders for body searches were entered by the court, which necessitated moving the trial date to 2/22/99. The trial court held that the date was moved until the evidence could be obtained and examined.  Manix argues that this was far too much time.  Yet the crime lab analyzing the evidence was backlogged.  This was no pretense on behalf of the prosecution; the backlog actually delayed both the State's case and Manix's.   This is shown by the next delay, which runs from 1/25/99 to 5/24/99 and was triggered by Manix.  He had filed a motion to continue because he had not yet received the results of the genetic testing performed by the crime lab and needed the information to adequately prepare his defense.  The delay affected both parties and was not pretextual. The delay was for good cause, was based upon credible evidence, and is accordingly not attributable to the State.

¶12.    The trial date of 5/24/99 was then changed to 8/30/99 because the court was trying another case  on the scheduled trial date. The 8/30/99 trial date was also changed to 12/6/99 for the same reason. We have noted that these delays cannot be charged to the State because a congested docket is considered "good cause" if the continuance is actually granted for that reason. *Humphrey v. State ,* 759 So.2d at 368, 377 (Miss. 2000).

¶13.    The next delay runs from 11/5/99 to 7/17/00. Manix filed a motion to continue on 11/5/99, offering that he had not yet received the DNA test results from the crime lab and that there were other issues which needed to be addressed.   Furthermore, Manix's attorney

7

withdrew from his case to take another job. A delay caused by the withdrawal of the defendant's attorney which entails allowing the new attorney a reasonable time to become familiar with the case and prepare for trial cannot be weighed against the State. *Johnson v. State,* 666 So.2d 784, 792 (Miss. 1995). Accordingly, this delay is not unreasonable. The 7/17/00 trial date was changed to 10/2/00 because a new prosecutor was appointed who needed time to review the case. Again, we find that this is good cause.

¶14. The next delays from 10/2/00 until 8/12/02 are not attributable to the defendant nor the State because they are the result of incomplete discovery due to the backlog facing the crime lab, the trials of the co-defendants jointly indicted with Manix, and the replacement of defendant counsel due to health concerns. These delays are within the reach of "good cause" and are based upon credible evidence.

¶15. Based upon the above timeline and after reviewing the reasons for the delays, we hold that the trial court's findings were based upon substantial credible evidence. Therefore, the delay of 1,430 days, while extreme, did not violate Manix's statutory right to a speedy trial.

### The Constitutional Right

¶16. While the statutory right to a speedy trial attaches at arraignment, the constitutional right attaches at arrest. *Adams*, 583 So.2d at 167. The constitutional right to a speedy trial is examined using a four-factor test developed by the United States Supreme Court. First, the length of delay is considered; secondly, the reasons for the delay; third, whether the defendant asserted their right to a speedy trial; and last, whether the defense suffered any prejudice from the delay. *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972).

8

### 1. *Length of delay*

¶17. Here, the length of the delay from arraignment to trial was more than eight months. This is presumptively prejudicial and weighs in favor of the defendant. *Smith v. State,* 550 So.2d 406, 408 (Miss. 1989).

### 2. *Reason for delay*

¶18. The *Barker* Court noted that neutral reasons for a delay such as negligence or overcrowded courts should be weighed less heavily in the speedy trial determination, yet still considered, since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. *Barker,* 407 U.S at 531. Accordingly, we generally place the burden of establishing good cause for delay on the State. *Perry v. State,* 419 So.2d 194, 199 (Miss. 1982). Despite that burden, this Court has been hesitant to weigh the delay heavily against the State where the cause lies with a "tentacle[] of the State," such as the state crime lab, rather than with the district attorney's office. *State v. Magnusen,* 646 So.2d 1275, 1281 (Miss. 1994).

¶19. In *Magnusen*, we declined to hold the State responsible for a five-month delay caused by inaction of a crime lab. *Id*. at 1281. We have also held that the "delay in time attributed to [a] FBI laboratory in preparing potentially exculpatory DNA evidence weighs very slightly, if at all, in favor of the defendant." *Gray v. State,* 728 So.2d 36, 48 (Miss. 1998). Moreover, mere negligence in causing the delay will only be slightly weighed against the State. *Perry v. State,* 637 So.2d 871, 875 (Miss. 1994).

9

¶20.    These facts underlying this facet of the ***Barker*** test were extensively examined in our discussion of the statutory right to a speedy trial.   Most of the delay  was not  attributable to Manix or the State, but instead resulted from the crime lab backlog or appointment of new counsel.   Manix contends that the replacement of the prosecutor increased the amount of delays.   The State's discretion as to which prosecutor will try a particular case is a basic tenet of our criminal justice system.   This Court has never held that the State's replacement of prosecutors amounts to a speedy trial violation warranting a reversal of a criminal conviction. Therefore,  this factor is slightly weighed against the State. ***Perry***, 637 So.2d at 875.

### 3. Assertion of right

¶21.    The State bears the burden of bringing a defendant to trial. ***Ross v. State***, 605 So.2d 17, 24 (Miss. 1992). ***Flores v. State,*** 574 So.2d 1314, 1321 (Miss. 1990). However,     a defendant's  assertion of his right to a speedy trial weighs more heavily in his favor than not asserting it. ***Johnson v. State,*** 666 So.2d at 793;  ***Jaco v. State,*** 574 So.2d 625, 632 (Miss. 1990). As the trial judge pointed out, Manix never formally demanded a speedy trial. His attorney moved  to dismiss for the State's failure to grant a speedy trial. However,  Manix testified that he was ready to proceed to trial in 1999, 2000 and 2001, as well as 2002.  He also asserted that he had agreed to one continuance but did so reluctantly because the crime lab had yet to test the evidence. Furthermore, on May 9, 2000, Manix wrote a letter requesting his discovery so that he could have a fair trial.  Although his attorney's did not demand a speedy trial, Manix made some attempts to obtain a speedy trial. Therefore, this factor weighs in favor of Manix.

### 4. Prejudicial effect of the delay

¶22. Finally, the State claims that Manix failed to prove any actual prejudice. This Court has declined to infer prejudice to the defense out of the "clear blue." *Magnusen*, 646 So.2d at 1284. Generally, this Court has found prejudice when there was a loss of evidence, the death of a witness, or the investigation became stale. *Hughey v. State*, 512 So.2d 4, 11 (Miss. 1987). Manix contends that as a result of the delay he has been unable to locate a witness who would have testified on his behalf. However, the record reflects that Manix could not even provide the full name of the alleged witness to his attorney; moreover, he did not give the name to his attorney until the Thursday before the trial. Manix provided no evidence to substantiate his inability to find the witness. Vague allegations of the existence of a poorly identified exculpatory witness does not constitute prejudice.

¶23. Manix also contends that the delay has had negative emotional, social, and economic impacts on his life. Mississippi case law does not recognize such impacts as prejudice. *Hughey,* 512 So.2d at 11. Since Manix has failed to prove actual prejudice this factor weighs against him.

¶24. We hold that Manix's constitutional right to a speedy trial was not violated. The reason for the delay weighs slightly against the State because it was negligent in replacing the prosecutor. However, when this fact is coupled with the fact that Manix's attorney never formally demanded a speedy trial, any presumptive prejudice Manix may have suffered is overwhelmed by the absence of actual prejudice.

  **II.  Whether the trial court abused its discretion in admitting photographs of the victim's body?**

¶25.    Manix urges that seven of the photographs shown to the jury lacked evidentiary value and inflamed the passions of the jury.  For example, S-17 shows the body of Heather Hampton on the carpet of the motel.  Partially in the photo are two emergency technicians attempting to stabilize her.  Her white blouse is soaked with blood  and has been torn open to provide access to her wounds, exposing her breasts.

¶26.    S-18 is substantially similar but is mainly a shot of the torso of the victim.  Her breasts are visible as well as several knife wounds to her chest.  Her blood-soaked shirt is also in the frame, along with the scissors used to cut her shirt and undergarments from her in the rescue effort.

¶27.    S-30 is not a crime-scene photograph, but was taken during the  post-mortem medical examination of the victim.  It is a close up of the neck of the victim, showing a slightly-larger than life view of the one-inch stab wound in her neck.  There is a ruler alongside the wound to show its scale.

¶28.    S-31 is a close-up of the victim's chest also taken while the victim's body was being examined.  She is nude, and there is blood splattered across her chest.  The close-up shows at least three stab wounds to the chest.  One of the wounds has a metal rod inserted in it; the rod allows the examiner to determine the angle of the wound.

¶29.    While objecting to these photographs and three others in general, Manix specifically objects to the photos that were taken during the post-mortem medical examination of the victim, arguing case law that finds widespread condemnation of the practice.  These arguments do not represent our position on this point of law.  We have allowed photographs from autopsies and other post-mortem examinations when the probative value of the photographs

12

outweighed their gruesome content.

¶30.    We have held that the admissibility of photographs rests within the sound discretion of the trial court. *Brawner v. State,* 872 So.2d 1, 14 (Miss. 2004); *Jackson v. State,* 684 So.2d 1213, 1230 (Miss. 1996); *Griffin v. State,* 557 So.2d 542, 549 (Miss. 1990).  Moreover, the decision of the trial judge will be upheld unless there has been an abuse of discretion.  This standard is very difficult to meet. *Brawner,* 872 So.2d at 14.  In fact, the "discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." *Id.*  As to the photos in general, we have often allowed gruesome photos, including photos after autopsies, with warnings to the prosecution and the trial court to guard against excess. *Walker v. State,* 740 So.2d 873, 880-88 (Miss. 1999); *Manning v. State,* 735 So.2d 323, 342 (Miss. 1999); *Jordan v. State,* 728 So.2d 1088, 1093 (Miss. 1988). While one photo might be probative, a series of photos can be prejudicial.  We allowed an autopsy photo in *Griffin v. State*, 557 So.2d at 549, because it was "probative in that it corroborated the finding made by [the forensic pathologist] that the shot was fired from an intermediate range."  Yet "we again caution[ed] prosecuting attorneys that there can be a limit both in the number of photographs and the manner in which they are displayed to the jury." *Id.* at 550.  "The discretion we have afforded circuit judges is by no means unlimited, and we strongly urge that they curtail excess." *Id.*

¶31.    One specific photograph of the victim's body may be probative, but ten similar photographs may be prejudicial.  One photograph of the body may inform the jury about the crime; ten similar photographs may inflame their passions.  Photographs that depict gruesome

13

subject matter may be highly probative to a case and should continue to be admitted, continuing our decades-long practice. Yet multiple photographs of the same subject are successively less probative and simply fan the flames of the jury's passion. We caution trial courts to scrutinize this issue closely and to guard against inflaming the passions of the jury.

¶32. In the instant case, the photographs of the victim's body had substantial probative value. They identified the victim and showed her as she was found at the crime scene. They helped corroborate the State's assertion of the manner, time and cause of death. They helped the jury to determine the credibility of Manix's statements to police and his testimony on the witness stand. Thus, we cannot say the admission of S-17, S-18, S-30 and S-31 either individually or collectively prejudiced Manix's right to a fair trial. It follows that the trial court did not abuse its discretion in the admission of photographs of the victim's body.

¶33. Manix also urges that the *McNeal* balancing test was not employed in admitting the photographs. In admitting gruesome photographs, we require our trial courts to utilize a simple two-part test. First, the trial court must determine whether the proof is absolute or in doubt as to identity of the guilty party. Secondly, it must be determined whether the photographs are necessary evidence or simply a ploy by the prosecutor to arouse the passion and prejudice of the jury. *See McNeal v. State,* 551 So.2d 151, 159 (Miss. 1989). In each instance where the prosecution offered a photograph of the victim's body, the judge simply announced that the photograph had more probative value than danger of prejudice. On the facts before us, the trial court's analysis of the *McNeal* factors was sufficient for admission of the photographs at issue. We have already dispensed with the notion that this case hinged upon the admission of the photographs. If the photographs had truly inflamed the passions of the jury it is doubtful

14

Manix would have received only a life sentence. We hold that the trial court did not err in conducting the *McNeal* balancing test prior to admission of the photographs. In summary, these photographs had probative value in accurately depicting the scene of the gruesome crime, as well as the means, time and cause of death. It follows that the trial court's admission of the photographs of the victim's body in the instant action did not constitute reversible error.

### III.      Whether the jury was properly sworn?

¶34.    Manix urges that the verdict announcing his guilt and his successive sentence to life in prison are void because the jury was not properly sworn. The facts are undisputed. The prospective jury pool was sworn twice, once before their qualifications were assessed and once afterward. Yet after voir dire had been conducted and the jury finally selected, the transcript does not reflect that they were  sworn. However, the final sentencing order entered by the trial court  stated, "Thereupon came a jury composed of twelve good and lawful jurors of Jackson County who were empaneled, accepted by both the state and defendant, **who were duly sworn according to law. . . . ."** (bold for emphasis). The State argues that this language creates a presumption that the order was correct, and specifically, that the jury was sworn. *See Young v. State*, 425 So. 2d 1022, 1025 (Miss. 1983); *Bell v. State,* 360 So.2d 1206, 1215 (Miss. 1978). In *Young,* the defendant challenged a criminal conviction wherein the record revealed that the jury was not duly sworn to try the issues at the outset of the trial. 425 So.2d at 1025. This Court noted that the record did not indicate whether or not the jury was specially sworn. *Id.* However, this Court refused to reverse *Young's* conviction holding that where the order contains language that the jury was sworn, a rebuttable presumption arises to the effect that the trial judge properly performed his duties of swearing the jury. *Id.* (citing *Bell,* 360

15

So.2d at 1215). We hold that because the final sentencing order entered by the trial court specifically states that the jury was sworn, a rebuttable presumption to this effect was created. Manix does not offer any evidence to rebut the presumption that the order was valid and the jury sworn.

¶35. Further, there is no evidence in the briefs, the record, or the trial transcript that Manix ever objected to the trial court's asserted failure to swear the jury. This Court has held that the failure of the court to specifically swear the jury in a capital case is waived where no objection is made by the defendant until the verdict is rendered. This issue cannot be raised for the first time on appeal. *McMillan v. State,* 191 Miss. 59, 61, 2 So.2d 823, 824 (1941) (citing *Hill v. State,* 112 Miss. 375, 383, 73 So. 66, 67 (1916)).

¶36. We hold that because Manix did not object to the issue of the unsworn jury until his trial was completed and a verdict was rendered, he has procedurally waived his claim to this assignment of error. Also, his claim fails on the merits because the final sentencing order clearly states that the jury was duly sworn. Manix did not present sufficient evidence to overcome the presumption that the trial judge properly performed his duties.

### IV. Whether the trial court erred in denying Manix's motion to suppress Manix's pretrial statements?

¶37. Manix argues that law enforcement officials coerced him into admitting the charged crime, and because of such, the trial court erred in denying his motion to suppress the confession. Manix contends that he was threatened with physical harm from former Ocean Springs police officer, Don Bourgeois, if he failed to state his involvement in the murder of Heather Hampton.

¶38.    This Court has held that "absent a knowing and intelligent waiver of rights, statements made by a suspect while under 'custodial interrogation' are inadmissible at trial where prior to making the statements, the suspect was not *Miranda* warned." *Tolbert v. State,* 511 So.2d 1368, 1374 (Miss. 1987) (citing *Miranda v. Arizona,* 384 U.S. 436, 444-45, 478-79, 86 S.Ct. 1602, 1612, 1630, 16 L.Ed.2d 694, 706-07, 726 (1966)).

¶39.    The general rule is that to be admissible, a confession must have been given voluntarily and not given because of promises, threats or inducements. *Dancer v. State,* 721 So.2d 583, 587 (Miss. 1998); *Morgan v. State,* 681 So.2d 82, 86 (Miss. 1996); *Chase v. State,* 645 So.2d 829, 838-39 (Miss. 1994).    The prosecution shoulders the burden of proving beyond a reasonable doubt that the confession was voluntary. *Morgan,* 681 So.2d at 86 (citing *Haymer v. State,* 613 So.2d 837, 839 (Miss. 1993).   This "burden is met and a prima facie case is made by testimony of an officer, or other persons having knowledge of the facts, that the confession was voluntarily made without threats, coercion, or offer of reward." *Morgan,* 681 So.2d at 87 (quoting *Chase,* 645 So.2d at 838) (quoting *Cox v. State,* 586 So.2d 761, 763 (Miss. 1991)). The circuit court sits as a fact finder when determining voluntariness of a confession, and its determination will not be reversed unless manifestly wrong. *Horne v. State,* 825 So.2d 627, 639 (Miss. 2002) (citing *Blue v. State,* 674 So.2d 1184, 1204 (Miss. 1996)).

¶40.    The converse of the general rule is true as well.  If a confession is the result of threat, inducements or promises – however slight – it is not voluntary. *Dunn v. State,* 547 So.2d 42, 45 (Miss. 1989); *Layne v. State,* 542 So.2d 237, 240 (Miss. 1989); *Agee v. State,* 185 So.2d 671, 674 (Miss. 1966).    Further, if it is not voluntary, then the confession is inadmissible

17

under the constitutional standards.

¶41. At the suppression hearing, Manix testified on direct examination that Officer Bourgeois informed him that Bourgeois was an expert in martial arts and that he could do severe damage to those who fell into his disfavor. According to Manix, Bourgeois told him that he "could do a lot of damage, break bones." On cross-examination it was established that Manix signed a *Miranda* warning form, which included the statement that no threats had been made against him. He further asserted that Bourgeois's graphic depiction of how he could harm another human being was the impetus of his waiver of his rights to silence and counsel. During the trial, the State introduced a videotape of Manix's confession (as Exhibit S-15) which was admitted over defense objections.

¶42. During the suppression hearing, the trial court heard testimony of several witnesses including Officer Bourgeois. The court received four signed waiver of rights forms, audio, transcribed, and videotaped statements. Having heard and received this evidence, the trial court concluded that the defendant's motion to suppress was without merit. The order of the trial court denying the motion, specifically found that the State have proved the admissibility of the confession beyond a reasonable doubt. The record reveals no basis to conclude that the decision was manifestly wrong. We hold that the State met its burden and made a prima facie case by offering the testimony of Officer Bourgeois that the confession was voluntarily made without threats, coercion, or offer of reward. It follows that the trial court did not err in admitting Manix's pre-trial confession.

## CONCLUSION

¶43. The record clearly reveals that Manix was not denied his right to a speedy trial under

18

either the statutory scheme or the constitutional standards. Because the photographs of the victim's body were neither individually nor collectively prejudicial to Manix's right to a fair trial, the trial court did not abuse its discretion in admitting them. The final sentencing order entered by the trial court specifically stated that the jury was sworn. Thus, a rebuttable presumption arose that the jury was in fact sworn which the defendant did not rebut. The record reveals sufficient evidence to establish that Manix's pre-trial statements were given voluntarily. Thus, the trial court was correct in denying Manix's motion to suppress. We affirm the judgment of the Circuit Court of Jackson County.

¶44. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT**, **WITHOUT PAROLE**, **IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR. DIAZ, J., NOT PARTICIPATING.**